DOCKETED

MAR 0 4 2003

UNITED STATES DISTRICT COURT
FOR THE NORTH DISTRICT OF ILLINOIS
EASTERN DIVISION

JERRY R. SUMMERS, GEORGE T.
LENORMAND and WOOD D.
EPPELSHEIMER, individually and on
behalf of all others similarly situated,

                    Plaintiffs,

    v.

UAL CORPORATION EMPLOYEE
STOCK OWNERSHIP PLAN, UAL
CORPORATION ESOP COMMITTEE,
MARTY TORRES, BARRY WILSON,
DOUG WALSH, IRA LEVY and JANE and
JOHN DOES consisting of unknown
members of the ESOP Committee,

                    Defendants.

No.

## 03C 1537

JUDGE HOLDERMAN

MAGISTRATE JUDGE MASON

FILED-EOD

03 FEB 28 AM 11: 23

CLERK
U.S. DISTRICT COURT

## CLASS ACTION COMPLAINT FOR VIOLATION OF ERISA

# TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION ................................................................................... 1

II.  JURISDICTION AND VENUE ............................................................................ 4

III. PARTIES ............................................................................................................... 4

IV.  CLASS ACTION ALLEGATIONS ..................................................................... 5

    A.   UAL's Financial Woes Predate September 11, 2001, Putting the
ESOP Committee on Notice of the Changed Nature of the
Appropriateness of UAL Stock as the Sole Retirement Asset
of the ESOP ................................................................................................... 7

    B.   UAL Stock Becomes a Highly Speculative Investment Triggering
the Committee's Fiduciary Duties ............................................................ 10

    C.   The Looming Bankruptcy ......................................................................... 15

    D.   The Committee Belatedly Appoints State Street to Make an
Independent Determination and State Street Sells UAL Shares ............ 23

    E.   American's Trustees Sell AMR Shares – An Example of
Prudent Conduct by Plan Fiduciaries ..................................................... 28

V.   PRAYER FOR RELIEF ....................................................................................... 30

Plaintiffs, by their undersigned attorneys, for their Class Action Complaint, allege upon personal knowledge as to themselves and their own acts, and upon information and belief (based upon the investigation of their counsel) as to all other matters, as to which allegations they believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery as follows:

## I.     NATURE OF THE ACTION

1.      This Class Action seeks relief on behalf of all persons who from the time period July 19, 2001 to the present are, or were, participants in or beneficiaries of the UAL Corporation Employee Stock Ownership Plan ("UAL ESOP").

2.      The UAL ESOP was formed in 1994 as the vehicle to "recapitalize" United Airlines ("the Recapitalization") pursuant to a transaction whereby plaintiffs and the members of the Class, acting through the UAL ESOP, invested no less than $3.3 billion in exchange for 55% ownership of UAL Corporation ("UAL"). As part of the Recapitalization, the UAL ESOPs committed to purchase approximately 17 million shares of UAL stock, with an initial purchase of approximately 1.8 million shares and the remaining stock purchases scheduled to occur during the next six years. In return, stock amounting to 55% of UAL was committed to be transferred to the UAL ESOPs in installments during the same period. Part of the consideration for this transaction required plaintiffs and the members of the Class to agree to substantial wage and benefit reductions and work rule changes.

3.      The UAL ESOP plan document provides that the ESOP should be exclusively invested in UAL stock. And at the time the ESOP was created, this made financial sense, and was prudent. UAL stock had, over the years, been relatively stable and it was believed it would appreciate as a result of the wage concessions that were part of the transaction that gave employees an ownership interest in UAL and thus was considered to be an appropriate investment for a retirement account. However, under

ERISA, a plan document is controlling only to the extent that it is consistent with ERISA and, as explained below, during the period July 19, 2001 to the present, UAL stock was of such a speculative and highly risky nature so as not to be an appropriate exclusive investment for the ESOP. In other words, the change in UAL's stability, which was dramatic, required a rigorous reexamination of UAL stock as a prudent investment for the ESOP, which comprised a substantial percentage of UAL employees' retirement savings.

4.      Decisions concerning the operation of the UAL ESOP are vested in a six-person committee ("UAL ESOP Committee"). Committee members are by law fiduciaries and ERISA requires that as fiduciaries the UAL ESOP Committee must manage the ESOP investments prudently and solely in the best interests of the ESOP participants. On or about September 27, 2002, State Street Bank and Trust ("State Street") acting as the newly appointed investment manager of the UAL ESOP, announced that having the ESOP exclusively invested in UAL stock "was not prudent" and announced it would begin selling UAL stock.

5.      The ESOP's sale of UAL stock however, was too little and too late. A prudent fiduciary would have divested and diversified at a much earlier date due to the change in financial circumstances of UAL.

6.      In January 2001, UAL projected a loss for the fourth quarter of 2000 but expected a modest profit for 2001. By mid-July 2001, however, the slowing economy, specifically the drop in business travel which made up 55% of UAL's revenue, and high labor costs, caused UAL to post massive second quarter losses ($292 million) and to project losses for the remainder of the year, possibly as high as $1 billion for all of 2001. On July 2, 2001, the Justice Department objected to a proposed merger with US Airways, and an analyst for UBS Warburg predicted that UAL would lose almost $20/share for the year. At the time of this announcement, UAL stock was trading in the $30/share range. To add to UAL's uncertainty came the events of September 11, 2001. On September 10,

2001, UAL common stock closed at $30.82 per share. When the market reopened on September 17, it closed at $17.50 per share.

7.     Confirming the gloomy and uncertain outlook for UAL that was apparent in July 2001, in mid-October 2001, UAL Chief Executive Officer James Goodwin, in a letter to employees stated, *"Before September 11 we were not in a comfortable financial state, with costs exceeding revenue on a daily basis* ... Today, the situation is exacerbated with costs exceeding revenues at four times the pre-September 11 rate. Today, we are literally hemorrhaging money . . . Cleary this bleeding has to be stopped – and soon – or United will perish sometime next year." At the time of this announcement, UAL stock was in the $12 to $14 per share range.

8.     Thus, even before September 11, 2001, by the admission of its own CEO, UAL was in a precarious financial condition. UAL's condition was such that the ESOP Committee could not, if an independent and prudent decision was being made, continue to recommend that the UAL ESOP remain exclusively invested in UAL stock. It was incumbent upon the ESOP and Committee members, when UAL's financial condition and future became speculative and risky, to begin diversifying the ESOP. However, the ESOP and ESOP Committee took no action to protect the interests of the ESOP participants and did nothing to respond to UAL's worsening financial crisis until UAL stock had lost a substantial portion of its value and was on the verge of bankruptcy. During this period of fiduciary inaction, the UAL ESOP lost hundreds of millions in value and UAL employees saw their retirements being diminished or wiped out, particularly those who by virtue of the ESOP Plan were not free to withdraw their funds from the ESOP. It was not until August 2002, with UAL facing bankruptcy, that the ESOP Committee determined that it needed the advice of an "independent" manager and appointed State Street Bank to assume that role. The ESOP Committee decided such an appointment was needed due to a disabling conflict that prevented Committee members from acting in the best interests of the ESOP. State Street immediately began selling

shares. However, by that time UAL stock had already declined to a trading range of $1.90 to $2.00 per share.

9. As alleged herein, the ESOP Committee's failure to promptly act to protect the ESOP was the result of an inherent and disabling conflict. Further, in failing to act in a timely fashion, the ESOP Committee breached its fiduciary duties.

10. Plaintiffs individually and on behalf of a class seek to recover damages for the ESOP Committee's breach of its fiduciary duty.

## II. JURISDICTION AND VENUE

11. This action arises under Sections 404, 405, 406, 408, 409, and 502 of ERISA, 29 U.S.C §§ 1104, 1105, 1106, 1108, 1109, and 1132. This Court has subject matter jurisdiction over this class action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

12. Many of the pertinent meetings and acts committed by defendants which give rise to the subject transaction occurred in this District. Venue is properly laid in this District under 29 U.S.C. § 1332(e)(2) because many of the breaches of duty alleged herein were committed in this District and, under § 1391(b), the causes of action asserted in this complaint arose in this District.

## III. PARTIES

13. (a) Plaintiff, Jerry R. Summers, was an employee of United Airlines for over 36 years and retired as a 747-400 Captain in September 2001. Mr. Summers was at relevant times an equity participant in the UAL Supplemental ESOP and was a beneficiary of the Supplemental Trust Agreement.

(b) Plaintiff, George T. Lenormand, was an employee of United Airlines and retired as a 747/777 Captain in October 2002. Mr. Lenormand is and was at all relevant times an equity participant in the UAL ESOP and is a beneficiary of the Trust Agreement.

(c)     Plaintiff, Wood D. Eppelsheimer, has been an employee of United Airlines for 35 years and is currently a 747-400 Captain. Mr. Eppelsheimer is and was at all relevant times an equity participant in the UAL ESOP and is a beneficiary of the Trust Agreement.

14.     At all relevant times, defendant UAL Corporation Employee Stock Ownership Plan ("UAL ESOP") has been an employee benefit plan within the meaning of § 3(3) of ERISA, 29 U.S.C. § 1002(3), and is or was an employee stock ownership plan within the meaning of § 407(d)(6) of ERISA, 29 U.S.C. § 1107(d)(6).

15.     At all times, the UAL ESOP was governed by a Committee, and the Committee, to the extent it is a legal entity, is named as a defendant herein ("UAL Corporation ESOP Committee" or "Committee").

16.     The UAL ESOP Committee has six members. Defendants Barry Wilson, Doug Walsh, Ivy Levy were members of the Committee. Jane and John Does are or were members of the Committee whose names are currently unknown. Each of these defendants had fiduciary responsibilities to those who participated in the ESOP.

17.     Under the terms of the ESOP, distribution of a participant's stock can only be made upon termination of employment. Therefore, for non-terminated employees, only the Committee had power to make a sell decision with respect to ESOP stock. Such a restriction further heightened the Committee's duty to protect ESOP participants.

## IV.     CLASS ACTION ALLEGATIONS

18.     Plaintiffs bring this action as a Class Action pursuant to Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who are or were participants or beneficiaries of the UAL ESOP at any time between of July 19, 2001 and the present.

19.     The Class consists of thousands of persons located throughout the United States, thus, the members of the Class are so numerous that joinder of all Class members

is impracticable. The exact number of Class members is not presently known to plaintiffs; however, as of July 12, 1994, the effective date of the Recapitalization, approximately 50,000 current or former employees of UAL were participants in the UAL ESOP and Supplemental ESOP. As of August 1, 2002, the UAL ESOP held approximately 47.5 million shares. The exact number of Class members can be determined by appropriate discovery.

20.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and ERISA litigation. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

21.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to individually seek redress for the wrongful conduct alleged herein.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether ERISA was violated by defendants' acts and omissions, as alleged herein;

(b)     Whether the ESOP Committee defendants breached fiduciary duties owed to plaintiffs and the members of the Class by failing to act prudently and solely in the interest of the UAL ESOP participants and beneficiaries; and

(c)     Whether plaintiffs and the members of the Class have sustained injury by reason of defendants' actions and omissions.

23.     Plaintiffs envision no difficulty in the management of this litigation as a Class Action.

- 6 -

## STATEMENT OF FACTS

**A.    UAL's Financial Woes Predate September 11, 2001, Putting the ESOP Committee on Notice of the Changed Nature of the Appropriateness of UAL Stock as the Sole Retirement Asset of the ESOP**

24.    UAL's financial troubles and unstable outlook predate the September 11, 2001 tragedy. As early as the closing months of 2000, UAL was plagued by labor issues and cash flow concerns that had serious implications for UAL's future and which triggered a duty of the UAL ESOP Committee members to carefully consider divestiture. One article from late 2000 cogently summarized some of the issues then facing UAL:

> When they look back on it, United Airlines employees and passengers will undoubtedly remember it as "The Summer from Hell." And they won't be talking about the weather.
>
> By far Denver's biggest carrier, United is taking a beating, *not only financially but in terms of its public image. Some experts say the problems and internal damage resulting from this summer of flight delays an labor disputes can never be fully repaired.*
>
> * * *
>
> "I don't know if you can ever fix it," said Bob McGowan, professor and chair of the department of management at Daniels College of Business at the University of Denver. "And customers suffer because there is very little competition at (Denver International Airport)."
>
> * * *
>
> United management has flip-flopped on its stories. First, cancellations were blamed on weather. Only last week did the airline officially acknowledge labor issues were behind most of the delays. [Emphasis added.]

25.    On October 24, 2000, UAL pre-announced a Q3 2000 loss of $1.29 per share. Analysts from Credit Suisse reported that the Q3 loss, higher than analysts had expected, contained favorable and unfavorable elements, with the latter winning out on a long-term basis. The analyst cited worsening labor costs as a long-term problem. The analyst noted:

**It Just Keeps Getting More Discouraging**

> Just when we thought that the major incremental concern
> facing UAL shares was the risk surrounding its efforts to
> acquire US airways, we are forced to take a new stance on
> the company's basic earnings power – and it is lower.
> Unfortunately, we cannot ignore the real probability that
> United's [sic] to its employees will spill over into other
> airlines. The result is that industry profitability will be
> compromised unless some carrier manages to reach a better
> balance between its employees' W-2s and the interests of
> its shareholders. We have hopes that the combination of
> higher wages and reduced productivity that underlies
> United's future labor costs will be checked on at least the
> productivity front at some of the other carriers. But we
> believe the real cost of United's cannot help but discourage
> airline investors.

26.     In its Form 10-K for 2000, UAL reported that it had earnings from operations of $654 million, an amount that was less than half of the prior year's earnings. Furthermore, its net earnings had declined precipitously to only $.04 per share in 2000, down from $9.94 per share in 1999. According to UAL, these results reflected "significant operational disruptions, as a result of labor-related delays and cancellations, as well as weather and air traffic control limitations, which adversely affected both revenue and expense performance . . . . The Company estimates the revenue shortfall arising from these disruptions and associated schedule reductions and cancellations to be somewhere between $700 and $750 million for the year."

27.     UAL's "Outlook for 2001" as reported in the Form 10-K for 2000 was bleak:

> The softening of the U.S. economy has had an industry-
> wide effect on business travel; as a result, the Company has
> experienced a decrease in high-yield near-term bookings.
> In addition, passenger revenue performance is expected to
> be negatively impacted by the reduced capacity level put in
> place to improve operational reliability. Given these and
> other weaker-than-anticipated revenues, combined with
> higher labor costs and fuel prices, the Company expects
> first-quarter results to be substantially below the current
> First Call consensus of $2.82 per share.

Moreover, UAL noted that "[t]he uncertainty surrounding key factors affecting the Company's financial performance, such as the breadth and length of the U.S. economic

slowdown, the outcome of the planned United and US Airways merger and the outcome

of labor negotiations and the cost of fuel, among other factors, precludes the Company

from providing any specific estimates on results at this time."

28.     Following the negative news of Q3 2000 and the 10-K for 2000, as well as

the uncertainty reported in the year 2000 Form 10-K, UAL reported in Q1 2001 a net loss

of $305 million or $5.82 per share for Q1 2001. According to its Form 10-Q for 1Q

2001, UAL then predicted that this was a trend that would continue and would result in a

loss for the full year:

> The Company expects the negative revenue trends that
> impacted first-quarter performance to continue during the
> second quarter. As compared to the second quarter of
> 2000, total unit costs are expected to increase twelve
> percent, primarily due to rising fuel costs and additional
> labor expense largely resulting from the ALPA and IAM
> contracts which became amendable in April and July of
> 2000, respectively. As a result, the Company is projecting
> a loss for the second quarter . . . [T]he Company also
> anticipates incurring a loss for the full year.

29.     In May 2001, ABN – AMRO industry analysts reviewed UAL's

operations in a report on the airline industry titled "The Four Horsemen of the

Apocalypse Plague the Airlines." The report pointed out that UAL's first quarter net loss

had exceeded both ABN's estimate and the "First Call consensus" and that for the

"second quarter management anticipates that current trends will cause a significant year-

over-year decline in unit revenue." The report also included the following:

> UAL's financial results were adversely impacted by a
> decline in higher-yielding business travel and a slowing
> economy. In addition, management believes that there has
> been some booking away as a result of the possibility of a
> work stoppage. Since UAL has a high percentage of
> business travelers and many of these customers are based
> on the West Coast, the downturn in the technology sector
> significantly weakened revenue generation. In addition to
> top-line weakness, the carrier also was plagued with rising
> costs in labor and fuel. These expense line items were
> significantly above the 1Q00 levels and contributed to
> UAL's large loss.

* * *

> For the second quarter, management anticipates that current
> trends will cause a significant year-over-year decline in unit
> revenue as compared to the same period in 2000. The
> lower levels of projected revenues accompanied by higher
> labor and fuel costs have caused the company's
> management to project a second quarter loss. If revenue
> trends continue on a longer-term basis, the airline believes
> a loss will be posted for the full year. . . . We recently
> made adjustments to the remaining three quarters of 2001
> to reflect the negative developments as outlined in
> management's guidance. As a result, we would not be
> acquirers of UAL stock and maintain our Reduce rating.

**B.      UAL Stock Becomes a Highly Speculative Investment Triggering the
Committee's Fiduciary Duties**

30.      On July 18, 2001, UAL announced the results of Q2 2001. As the

Company and stock analysts had projected UAL reported yet another loss, this time $365

million or $6.87 per share, results that management noted in the Form 10-Q for 2Q 2001

to reflect "a challenging quarter for the airline industry and United in particular:"

> The effects of the weaker economy have affected the airline
> industry more than other areas of the economy, as
> corporations reduce their business travel budgets and
> change their travel behavior. United has experienced a
> significant revenue decline as a result of the decrease in
> business traffic, which has impacted both unit revenues and
> yields.

At the same time, the Company again warned not only that it "expect[ed] the negative

revenue trends that impacted the first six months to continue" but that it "anticipat[ed]

incurring a loss for the full year." For the prior year's Q2, UAL had earnings of $374

million, making the difference between the two quarters over $600 million.

31.      On August 13, 2001, Moody's issued a negative opinion on UAL's

outlook.

32.      In response to the financial effects of the events of September 11, 2001,

Moody's further downgraded UAL from B2 to Ba1, noting that it believed "operating and

financial burdens for United and the rest of the airline industry" were going to a real issue as to future risk regardless of possible federal aid.

33.  In testimony before the Senate Committee on Commerce, Science and Transportation on Thursday, September 20, 2001, R. Neidl, an airline analyst with ABN AMRO, noted that UAL had given its cash burn rate enough cash to survive only 110 days without government aid.

34.  Further darkening UAL's future was a letter sent to employees by CEO Goodwin in which he claimed that "this bleeding has to be stopped – and soon – or United *will perish sometime next year*."

35.  The full text of the letter sent to United Airlines employees by CEO James E. Goodwin on or about October 17, 2001 stated:

> Dear Fellow United Employee:
>
> This is the first of a series of letters to keep you abreast of what's happening at United and our evolving financial situation.
>
> Prior to Sept. 11, all of the major U.S. airlines were having financial difficulties as a result of the weakening economy. The economic pain was worse for us because we rely more heavily on frequent business travelers for our business than they do. But, while things were difficult, we were putting in place the cornerstones of a strategic plan to improve our revenue and profitability.
>
> Then came Sept. 11.
>
> In the wake of that day's horrific events, *we are in nothing less than a fight for our life. Never in our 75-year history have we faced an economic challenge of this magnitude, where the drop-off in air travel has been so unexpected and prolonged.*
>
> Our number one priority now is to get United into a financial position that will allow us to continue operating. We are not there yet. To get there, we must focus on break-even cash flow. That means being in the position where we have as much money coming into our bank account as we have streaming out of it. In the past, we struggled to make a profit. *Now we're in a struggle just to survive.*

So getting ourselves back to a break-even cash flow –
whatever it takes – is job one for the foreseeable future.
Because if we don't succeed we'll eventually run out of
money – it's that simple and that painful.

Let me illustrate the financial hole we're in. *Before
Sept. 11, we were not in a comfortable financial state,
with costs exceeding our revenue on a daily basis.* Today,
the situation is exacerbated with costs exceeding revenue at
four times the pre-Sept. 11 rate. *Today, we are literally
hemorrhaging money.*

*Clearly, this bleeding has to be stopped – and soon – or
United will perish sometime next year.* We need to get this
loss rate down to zero. ... That will give us the breather we
need to regain our bearings and start crawling back to
profitability and begin to rebuild our balance sheet.

While we do have a cushion from borrowing, government-
guaranteed loans and other sources available to us, this
leaves absolutely no room for complacency.

*Pan Am and Eastern went too far down that trail and
never returned.* They borrowed to meet expenses – then
borrowed some more against assets to pay off the initial
loans – and then were forced to sell their assets to cover the
second loans. In short, they borrowed their tomorrows to
live just another few days.

We don't want to follow in those footsteps because we
recognize that loans are merely crutches, not cures. I want
to make it clear: Our top priority now must be to reduce
costs and increase revenue to the point where what we
spend (in all areas, including payroll and operations) equals
what we take in (from sales of passenger tickets, cargo and
other sources).

We've already done much to cut costs. We've immediately
reduced our flying schedule by 20 to 25 percent; shut down
nonaircraft capital projects (including JFK Terminal 6 and
Dulles Tier 2); reduced supplier and discretionary pending,
and – most difficult of all – decided to furlough 20,000
United employees.

I wish I could report that work in this area is completed. It
isn't. We are continuing to look at all aspects of our
business – from payroll and operations to examining the
costs under our labor contracts. Nothing is sacred or off-
limits.

We also are working hard to generate revenue. The first
step is to get people comfortable about flying again. We
and the rest of the industry – along with the U.S. President,

other elected officials and government agencies – are doing everything we can.

To get passengers back on our planes, we also need to convince them that airline travel is safe. We are joining with the rest of the industry and the government to implement a number of measures, including reinforced cockpit doors and placing responsibility for security under federal jurisdiction. We're also issuing special fares, Mileage Plus offers and new ads that will feature United employees encouraging our customers to return to the skies.

However, much of our success in generating revenue will depend upon you. Once we bring customers back to our ticket counters, gate areas and airplane cabins, it will be up to you to make them comfortable and provide them with the service they've come to expect from United.

I'm very proud of the work you're doing. In the wake of the Sept. 11 tragedies, I've seen a renewed spirit at United. People are giving more of themselves to this company than I've ever witnessed in the 35 years I've been here. This is the true fabric of United.

Thank you for your loyalty, for your hard work and for your service on behalf of our customers in these, the most difficult of times. Let's keep it up. The sooner we get to break even, the sooner we'll remove the doubts about our future.

Sincerely,

James E. Goodwin

Chairman and Chief Executive Officer  [Emphasis added.]

36.     On October 23, 2001, R. Thomas Buffenbarger, the President of the

International Association of Machinists and Aerospace Workers, AFL-CIO, wrote to

UAL's Board of Directors and underscored the importance of the letter when he noted

that that UAL's "management concluded that the [Goodwin] letter was so newsworthy

from a financial point of view that the letter has been filed with the SEC and posted on

EDGAR."

37.     Mr. Goodwin's assessment, which turned out to be largely accurate, made

it absolutely clear that even prior to September 11, 2001, UAL was a fundamentally

different company than when the ESOP was created. And, the reference to Pan Am and Eastern should have been particularly troubling to the ESOP Committee members as employees of those companies had lost their retirement to the extent they had been invested in company stock. Further, Mr. Goodwin's evaluation of UAL was not news to the UAL ESOP Committee defendants. Yet these defendants did nothing with respect to efforts to minimize or reduce the risk to ESOP participants. Their inaction was the result of a conflict they had by virtue of their employment with the company. They believed that selling shares would be an act of disloyalty to the Company at a time the Company needed their loyalty. And, loyalty to the Company is perhaps a noble cause. However, rather than evaluating what action to take from the perspective of only the best interests of the ESOP, which was their duty as a matter of law, the Committee members were more concerned with their loyalty and support for UAL. Many employees had called Goodwin's letter the "Chicken Little" letter. Not wanting to be deemed "chicken," the Committee members did nothing. By this point, the Committee members' conflict arising from their divided loyalties and obligations was so significant that a prudent fiduciary would have appointed an independent investment advisory.

38. At the time of Mr. Goodwin's letter, UAL stock traded in the range of $18 to $20 per share.

39. By October 2001, UAL knew that to survive it needed to have three critical issues facing the Company resolved in a positive way: (1) significant and unprecedented wage concessions were needed to reduce labor costs, (2) billions in loans would be needed from lenders or from the Air Transportation Stabilization Board, and (3) the decline in air traffic had to change. Each of these issues presented significant risk to UAL's stability and each needed to be resolved positively for UAL to survive. Members of the UAL ESOP Committee were aware of each of these issues and the high degree of risk in accomplishing all or any of them. All of these issues continued to transform UAL from a stable airline, which it was at the time the ESOP was created, to a

- 14 -

completely different type of company, whose stock was not suitable as the exclusive investment vehicle for an ESOP.

## C.     The Looming Bankruptcy

40.     By the time of Goodwin's October 17, 2001 letter to employees, the possibility of a UAL bankruptcy was imminent and real and remained so up until the time UAL declared bankruptcy. In fact, as revealed much later by UAL spokesperson Joe Hopkins, the threat of insolvency was so real that UAL hired bankruptcy experts to give it advice shortly after September 11, 2001, and retained those attorneys thereafter. In fact, during the period October 2001 until September 2002, the probability of bankruptcy increased, a fact that is evident from reviewing the Company's SEC filings following September 11, 2001.

41.     Thus, UAL reported a Q3 2001 loss of $542 million. Without the exclusion of extraordinary one-time items, the loss would have been a staggering $1.2 billion, or a loss per share of $21.43. An article in the NEW YORK TIMES reviewed United's troubles:

> The UAL Corporation, the parent of United Airlines, reported a record loss yesterday for the third quarter in the wake of the terrorist attacks and predicted that the current quarter would be even worse.
>
> The company said that it lost $1.16 billion, or $21.43 a hare, compared with a loss of $116 million, or $2.30, in the corresponding period of 2000. Revenue fell 16.3 percent, to $4.1 billion from $4.9 billion.
>
> United's troubles have *deepened since May 2000*, when a dispute with its pilots resulted in the cancellation of thousands of flights, alienating passengers and costing tens of millions of dollars. On Sunday, the board forced the chairman and chief executive, James E. Goodwin, to resign.
>
> One of the key challenges for his successor, John W. Creighton, Jr., is regaining the confidence of investors, who have sent UAL's stock plunging to its lowest levels in 15 years.

> But his debut was not an alloyed success. After reading a
> prepared statement to analysts during a teleconference
> yesterday, Mr. Creighton declined to answer questions,
> saying he had to leave for another appointment. A United
> spokesman would not say what was on Mr. Creighton's
> calendar.
>
> "He ran for the hills," remarked Kevin Murphy, an analyst
> with Morgan Stanley. "What could be more important than
> speaking to shareholders at a time like this?"
>
> *   *   *
>
> Frederic F. Brace, UAL's chief financial officer, *said the
> airline was now losing about $15 million a day,* less than
> previous estimates of $20 million, and about the same as
> the daily loss at the rival American Airlines. United has
> $2.7 billion in cash at the end of the quarter and expects to
> have $2.3 billion at the end of the year.
>
> *But the airline warned that its operating losses this
> quarter would be substantially larger than in the third
> quarter.* United has reduced passenger capacity by 21
> percent, but like other airlines it cannot cut costs that much.
> [Emphasis added.]

42.     On or about February 15, 2002, UAL announced a Q4 2001 loss of
$308 million, bringing its total loss for 2001 to an astounding $2.1 billion or $39.90 per
share, the worst ever in airline history. Its loss from UAL operations was $3.8 billion in
2001, compared to operating earnings of $654 million in 2000, a net swing of over $4.4
billion. In response to this, analysts renewed predictions that bankruptcy was an
increasing risk. At this point, UAL stock was trading in the $12 per share range.

43.     In its Form 10-K for 2001, published on February 28, 2002, UAL
summarized its "Results of Operations" and discussed the factors that accounted for its
negative performance during the past two years:

> During early 2001, the weakening U.S. economy had a
> significant impact on the airline industry as corporations
> reduced their business travel budgets and changed their
> travel behavior. During the first six months of the year, the
> industry experienced a significant revenue decline as a
> result of the decrease in business traffic, which impacted
> both unit revenues and yields, particularly in the domestic
> markets. Airline industry domestic unit revenues, as
> reported to the ATA, declined by 12% to 13% in each of

- 16 -

the months from May through August, respectively. United, due to its significant reliance on high-yield business traffic, was disproportionately affected during this period.

In addition, United's revenues, yield, revenue passenger miles and available passenger miles were significantly impacted by the events of September 11 and the resulting reduction in the Company's operations. The Company estimates that the September 11 terrorist attacks negatively impacted the Company's revenues by approximately $1.7 billion.

During 2000, the Company experienced significant operational disruptions, as a result of labor-related delays and cancellations, we all as weather and air traffic control limitations, which adversely affected both revenue and expense performance. The Company attempted to mitigate the impact of these operational difficulties by reducing capacity, particularly in the domestic markets, where most of the problems were concentrated. The Company estimated the revenue shortfall arising from these disruptions and associated schedule reductions and cancellations to be somewhere between $700 and $750 million for the year.

44.     The Form 10-K for 2001 also warned about the material adverse financial effects that were expected to continue into 2002:

At this point, due in part to the lack of predictability of future traffic, business mix and yields, United is unable to fully estimate the impact on it of the events of September 11, 2001 and their consequences and the sufficiency of its financial resources to absorb that impact, including the mitigating effects of the [Air Transportation Safety and System Stabilization] Act and the Company's aggressive actions to reduce its costs. However, given the magnitude of these unprecedented events and the possible subsequent effects, United expects that the adverse impact to its financial condition, its operations and its prospects will continue to be material.

* * *

While starting to see some positive revenue trends, the Company expects to report a significant loss in the first quarter of 2002.

45.     The Company's prediction of a first quarter loss soon eventuated when, on or about March 15, 2002, UAL announced its first quarter results and reported losses

from operations of $711 million, as compared to $391 million in operational losses from Q1 2001. Operating revenues had decreased $1.1 billion between these periods. UAL stock was trading in the $15 to $16 per share range at this point. Still, however, the ESOP Committee did nothing to protect the ESOP participants.

46.     When it was filed on April 29, 2002, UAL's Form 10-Q for 1Q 2002 included a variety of reasons for this continuing negative trend. For instance, the report noted that the primary source of cost savings that were necessary to offset UAL's severe revenue was not being realized in a timely manner:

> [C]omplications with negotiating labor contracts have slowed the Company's progress on achieving further reductions to labor and other operating costs. Management continues to have discussions with the leadership of United's unions and to work towards a solution to increase productivity and reduce operating expenses, including labor costs. The resolution of these issues is taking longer than anticipated.

47.     Thus, the "Outlook for 2002" published in the 1Q 2002 Form 10-Q was replete with significant risk factors that accounted for the Company's prediction that it would "report a significant second quarter loss, as well as a full loss for the year." Those "risks and uncertainties" that "could significantly impact net earnings, revenues, expenses, unit costs, load factor, cash flow, and capacity" included:

> ... the economy and the demand for air travel; the ability to reduce operating costs and conserve financial resources, taking into account increased costs incurred as a consequence of the September 11 terrorist attacks to the Company; the higher costs associated with new airline security directives and any other increased regulation of air carriers; the significantly higher costs of aircraft insurance coverage for future claims caused by acts of war, terrorism, sabotage, hijacking and other similar perils, and the extent to which such insurance will continue to be available; the ability to raise and the cost of financing in light of the September 11 events and the possibility of any further credit downgrades of the Company; the cost of crude oil and jet fuel; the airline pricing environment; industry capacity decisions; competitors; route decisions; the success of the Company's cost-reduction efforts; the success of the Company's implementation of its financial

- 18 -

recovery plan; results of union contract negotiations and
cost-reduction discussions and their impact on labor costs
and operations; actions of the U.S., foreign and local
governments; foreign currency exchange rate fluctuations;
the economic environment in general.

Again, however, the ESOP Committee took no action consistent with its fiduciary duties

to the ESOP participants.

48.　　On July 19, 2002, UAL announced yet another large quarterly net loss

amounting to $392 million or $6.99 per share. According to the Company's Form 10-Q

for 2Q 2002, UAL had a net loss for the first six months of 2002 of $850 million or

$15.27 per share compared to a net loss of $670 million or $12.70 per share the same

period in 2001. The Form 10-Q provided the following explanation of the Company's

continued deterioration:

> [B]eginning in 2001, the weakening U.S. economy had a
> significant impact on the airline industry as corporations
> reduced their business travel budgets and changed their
> travel behavior. During the first six months of 2001, the
> industry began experiencing significant revenue declines as
> a result of the decrease in business traffic, which impacted
> both unit revenues and yields, particularly in the domestic
> markets. Historically, there has been a strong correlation
> between airline revenues and corporate profitability. As
> corporate profitability dropped during this period,
> companies reduced spending on travel. Since
> approximately 65% to 75% of United's domestic revenues
> are derived from business travelers, United was
> disproportionately affected by this decline.
>
> Subsequent to September 11, United's revenues, yield,
> revenue passenger miles and available seat miles were
> significantly impacted by the events of September 11 and
> the resulting reduction in the Company's operations. The
> Company continues to suffer from the weakened revenue
> environment resulting from the events of September 11 and
> a slowing U.S. economy. While year-over-year unit
> revenues had been improving each month in 2002 from a
> 14% decline in January to a 4% decline in May, June unit
> revenue performance was actually slightly worse than in
> May.

49. The bottom line of the 2Q 2002 Form 10-Q was management's "Outlook for 2002" – "The Company expects to report a significant third quarter and full year loss."

50. In fact, during the period August 2001 – August 2002 the shares of UAL fell over 80%, the largest drop of any airline other than US Airways Group Inc. In July 2002 alone, UAL's share value dropped 48% following its weak second quarter reported earnings and its bleak future outlook. Its cash balance was on a schedule to fall below the $1 billion minimum required for liquidity. Its costs had continued to increase as the result of sizeable raises awarded its mechanics, flight attendants, and pilots.

51. According to its Chief Financial Officer, Frederic Brace, UAL's precarious financial condition had prevented it from accessing the capital markets for quite some time. Thus, in announcing the Company's 2Q 2002 results on July 19, 2002, Brace flatly stated that UAL was "dealt a major financial blow by the events of Sept. 11 and we do not have the access to the capital markets that we need." He added, "In addition to our other cash needs, we have nearly $900 million in debt coming due near the end of the year and are concerned about our ability to refinance it." As a result, as of June 24, 2002, UAL belatedly submitted an application for a federal loan guarantee to the Air Transportation Stabilization Board, asking that the government back $1.8 billion of a $2 billion loan.

52. UAL's Form 10-Q for 2Q 2002 spelled out the necessity for the loan guarantee in more detail and also warned of the consequences of rejection:

> Given the Company's substantial capital spending and debt repayment requirements for the remainder of 2002, the Company has been actively pursuing financing alternatives. However, since September 11, United has not been able to access the public capital markets and has had limited access to private capital markets. Therefore, in June 2002 the Company filed for federal loan guarantees with the Air Transportation Stabilization Board . . . .
>
> In the absence of federal loan guarantees, the Company has insufficient access to the capital markets to refinance the

- 20 -

> debt due in the fourth quarter. While UAL's current cash reserves are sufficient to repay these obligations, the cash reserves then remaining could be insufficient to support the Company's ongoing obligations if it continues to generate negative cash flow from operations. In the absence of federal loan guarantees, and the cost reductions necessary to achieve them, there is no assurance that the Company will be able to raise sufficient liquidity to support obligations through the end of 2002.

53.     More importantly, the Form 10-Q for 2Q 2002 also warned that the ATSB application was already in trouble:

> It is within the discretion of the ATSB to decide whether to issue a guarantee in the amount and on the terms requested or at all. In evaluating the application, the ATSB may also consider whether an equity stake for the federal government in UAL is required and the extent of relief provided by the Company's stakeholders that would improve United's financial position. Although United has obtained relief from some employee groups and various other stakeholders, the reductions (as a percentage of total costs) achieved to date are significantly below those announced by US Airways Group, Inc. ("US Airways") as part of the conditional approval of its loan guarantee from the ATSB.

In other words, UAL admitted that the business plan it had initially submitted to support the application, one that had been formulated over a period of several months prior to submission, was deficient because the cost reductions were not deep enough to satisfy the ATSB. As a result, the Company announced that "after meetings with the staff of ATSB" it was preparing an "updated business plan" predicated on "broader, deeper and longer-term cost savings from the Company's stakeholders" and warned that there was both no assurance that those stakeholders would be amenable to granting the concessions required to achieve those savings or that "even if it does reach such agreements, the Company will be able to get ATSB approval for loan guarantees."

54.     UAL's precarious condition was underscored by the ATSB's rejection of UAL's application for that loan guarantee. On December 4, 2002, after almost six months of effort on UAL's part to get Board approval, and despite UAL's having recast its cost structure several times, the application was soundly turned down on grounds that

- 21 -

UAL's business plan was unsound. In a letter explaining its decision, the ATSB fully explained that conclusion:

> Based on this information and applying the criteria set forth in the Act and Regulations, the Board cannot approve the proposal submitted by United. The Board believes that the business plan proposed by United is not financially sound. In the Board's view, United's management presented a business plan that does not position the company to meet the challenges of the current airline industry environment and to achieve long-term financial stability. The Board believes that, even if the company were to receive the proceeds of a guaranteed loan, there is a high probability that United would face another liquidity crisis within the next few years. The Board's financial consultant assigned the proposed loan an extremely low credit rating, implying that United is more likely than not to default. The Board believes that the company's proposal poses an unacceptably high risk to U.S. taxpayers and does not support the conclusion that there is a reasonable assurance of repayment of the proposed loan. The Board would like to make you aware of the following fundamental deficiencies in United's proposal:
>
> First, the Board has concluded that United's revenue projections are unreasonably optimistic.
>
> - United's business plan is predicated upon a significant near-term rebound in revenue. In particular, United forecasts that its passenger unit revenue (revenue per available seat mile) will rise sharply in the near-term due to a significant increase in yields. This forecast for unit revenue growth in the next few years is substantially more optimistic than forecasts of industry observers and the Board's consultants. The Board does not concur with United's explanation for this divergence.
>
> - The more conservative alternative projections submitted by United, which assume a delayed industry revenue recovery, anticipate near-term unit revenue growth that is still in excess of the base case expectations of industry observers.
>
> - The Board also believes that the company's revenue forecast does not make sufficient allowance for the likely effects of continued expansion by low-cost carriers in United's markets as well as other potential structural changes affecting industry revenue.

Second, the Board believes that more reasonable revenue forecasts for United would not support the company's cost structure as presented in the business plan. The Board notes that even with the benefit of United's proposed cost reduction initiatives, United would remain among the highest cost carriers in the industry. If competitors are successful in achieving additional cost savings, United's relative cost position could weaken further.

Third, the Board has substantial concerns about the underfunded status of United's pension plan. Even if United obtains a waiver to reduce near-term funding requirements, required cash outflows will likely remain substantial over the term of the proposed loan. The Board is concerned about United's ability to generate sufficient cash flows to meet its pension funding obligations concurrent with other obligations, including repayment of the guaranteed loan.

Fourth, United has proposed that the loan be secured by a significant collection of assets. The proposed collateral package does not overcome the deficiencies of the business plan and associated default risk. Analysis by the Board's consultants and staff indicates that the collateral package is likely to have substantially less value in the event of default than is estimated by United. The Board believes that there is a significant risk that the recovery value will be less than the outstanding amount of the loan.

55.     The unsoundness of the UAL business plan was based on problems that had been facing the Company for at least a year and were known to Committee members. In fact, UAL management had held a series of informational meetings with United's unions and had briefed them on the Company's efforts "toward financial stability," as reported in UAL's 10K for 2001. On information and belief, ESOP Committee members were aware of the information reported at those meetings or should have been made aware of the facts conveyed at these meetings. This information made it clear that UAL was not a financially stable company.

**D.     The Committee Belatedly Appoints State Street to Make an Independent Determination and State Street Sells UAL Shares**

56.     On August 14, 2002, UAL announced that it might file for bankruptcy protection.

- 23 -

57.     In September 2002, the ESOP Committee appointed State Street as

"investment manager."  The Committee did so, in part, due to the conflict its members

had.  That conflict is referenced in a Question and Answer menu on the website of the

Machinist's Union ("IAM"):

> **Why are the ESOP shares being sold?**
>
> The investment of the ESOP is governed by federal law,
> the Employee Retirement Income Security Act of 1974
> ("ERISA").  ERISA has two investment requirements that
> have led to the selling of shares.  First, when deciding how
> to manage the ESOP, only the interests of ESOP
> participants and beneficiaries *in their capacity as*
> *participants and beneficiaries* can be considered.  This
> means that even though most ESOP participants are
> employees of United, and even though *as employees* they
> might prefer that the ESOP continue to hold only UAL
> stock, their preferences as employees cannot be considered.
> Second, ERISA requires that the ESOP be managed
> prudently.  State Street Bank was appointed to
> independently determine how the ESOP's investments
> should be managed in light of these two requirements of
> ERISA.  After a careful investigation, State Street
> determined that it was imprudent to continue to hold UAL
> stock, and commenced selling UAL stock.  [Emphasis
> added.]

58.     In this Q&A, there is the recognition that as employees, which the

Committee members were, there might exist a desire not to sell due to a perceived

disloyalty to the Company by taking such an action, which conflicted with the duty of a

fiduciary to act solely in the best interests of the ESOP participants.

59.     Elsewhere in the Q&A, the IAM makes reference to the need to ask State

Street to "independently" review the ESOP – again, another admission of the conflict.

> **Why did the Committee decide to appoint State Street**
> **Bank as investment manager of the ESOP's assets?**
>
> Following the announcement on August 14, 2002, that the
> Company was considering a bankruptcy filing, the
> Committee reviewed whether *it should delegate the duty to*
> *manage the ESOP's investments to an independent expert*
> *to ensure that* all decisions regarding the investment of the
> ESOP's assets are being made independently and will

- 24 -

continue to be made solely based on the best interests of ESOP plan participants.

Acting in the best interests of plan participants, the Committee unanimously decided to appoint State Street as investment manager of the ESOP's assets. State Street, the trustee of the ESOP since its inception in 1994, is familiar with the UAL ESOP and has significant experience in managing and overseeing retirement plan investments. [Emphasis added.]

60. If the UAL ESOP Committee felt it needed an "independent" assessment, that need did not arise solely due to the filing of the bankruptcy. Rather the need for an independent non-conflicted fiduciary was always required by ERISA.

61. The Q&A also admits that the plan document did not control in these circumstances:

> **The ESOP document says that ESOP should be exclusively invested in UAL stock. Why doesn't that prevent sales?**
>
> Under ERISA, a plan document is controlling only to the extent the plan document is consistent with ERISA. (Although this rule may seem surprising at first, without this rule, it would be easy to write a plan that would circumvent the law.) Thus, the ESOP document cannot override the ERISA investment requirements.
>
> The United States Department of Labor has very clearly stated that a plan document may not be relied upon to avoid the ERISA investment requirements.
>
> **I have heard that ERISA says that an ESOP is not required to diversify its investments. Doesn't that mean the ESOP could continue to hold all of the stock?**
>
> For most retirement plans, ERISA requires diversified investments. Furthermore, ERISA prohibits most retirement plans from ever having more than 10% of plan assets in stock of the employer. There is a limited exception to these diversification rules for certain types of plans, such as 401(k) plans and ESOPs. (Without this exception, it would be impossible to ever have an ESOP, since ESOPs are not invested for diversification.) However, this limited exception to the diversification rules is *not* an exception to the other ERISA investment rules described above. [Emphasis added.]

62.     The IAM Q&A admitted that fiduciaries had an obligation to determine

whether the ESOP's continued exclusive investment in UAL stock was prudent:

> **What is State Street's role going forward?**
>
> *As investment manager, State Street has the responsibility to determine whether the ESOP's continued exclusive investment in UAL stock is consistent with the law governing retirement plans* – the Employee Retirement Income Security Act of 1974 (ERISA). Following a thorough analysis, State Street determined that remaining exclusively invested in UAL stock at the present time was inconsistent with ERISA given the financial issues currently facing UAL, and they initiated action to commence sales of some stock.
>
> State Street will continue to analyze whether ERISA requires them to continue to invest ESOP funds in UAL stock, or take other investment actions, on an ongoing basis. Although State Street has commenced sales of some stock, they are constantly reviewing that decision and can decide at any time to halt stock sales, buy back UAL stock, or make other investment decisions they feel are in the best interests of plan participants and required by ERISA. [Emphasis added.]

63.     However, this duty under ERISA was always present, was triggered as

early as July 2001, and was breached by defendants.

64.     The duty of the ESOP Committee members to not follow the exclusivity

provisions of the UAL ESOP, due to UAL's condition, was recognized (belatedly) in a

letter sent to ESOP participants:

> Dear ESOP Participant:
>
> We are writing to advise you about an important decision made by the ESOP Committee for the UAL Corporation Employee Stock Ownership Plan. The Committee consists of six members appointed by ALPA, the IAM and the Company. Following the announcement on August 14, 2002 that UAL was considering a bankruptcy filing, the Committee reviewed whether it should delegate the duty to manage the ESOPs investments to an independent expert to ensure that all decisions involving the management of the ESOPs assets remain above reproach. Acting solely in the best interests of ESOP participants and beneficiaries, the Committee unanimously decided to appoint State Street Bank and Trust State Street as investment manager of the

ESOP's assets. In addition to serving as investment manager for the ESOP, State Street will continue to serve as Trustee for the ESOP, as it has done since the ESOP inception in 1994.

State Street is an industry leader in providing independent fiduciary services to employee retirement plans. State Street is familiar with the UAL ESOP, and has significant experience in managing, servicing and overseeing retirement plan investments. *The Committee is confident State Street will act solely in the best interests of ESOP participants and beneficiaries.*

*As investment manager, State Street has the responsibility to determine whether the ESOP's continued investment in UAL stock is consistent with the law governing retirement plans,* the Employee Retirement Income Security Act of 1974 ("ERISA"). Following a thorough investigation, State Street determined that the ESOP's continued investment solely in UAL stock was inconsistent with ERISA and that it was in the best interests of participants and beneficiaries to commence sales of UAL stock held by the ESOP. In order to begin sales, State Street was required to file a form with the Securities and Exchange Commission. On September 27, 2002, State Street filed this form, allowing it to sell up to approximately 11 million shares of UAL stock on behalf of the ESOP within the next three months.

You should know that when State Street sells any shares of UAL stock in the ESOP, the shares are sold, pro rata, from all ESOP participants accounts. State Street is currently investing the proceeds from sales of UAL stock in the ESOP in a short-term investment fund. The proceeds and any investment earnings will be credited, pro rata, to all ESOP participants accounts.

In continuing to fulfill its investment management responsibilities under the ESOP, State Street must carefully analyze the prudence of UAL stock as an investment on an ongoing basis. Thus, although State Street decided September 27 that selling UAL stock was appropriate, it could decide at any time to stop selling UAL stock, buy back UAL stock, or take other actions it determines are appropriate.

You should also know that the delegation of investment management authority to State Street applies only to the tax-qualified ESOP; it does not apply to the Supplemental ESOP (also known as "ESOP 3"). No sales will be made with respect to the credits for stock that you may have in an account under ESOP 3. ESOP 3 will continue to operate without change.

Following the delegation to State Street, the Committee continues to have administrative responsibility for the ESOP, including an obligation to monitor State Street activities as investment manager. The Committee has and will continue to meet with State Street on a regular basis.

We recognize that this decision may generate questions, and we will work with all parties to provide additional information when appropriate.

Sincerely,

ESOP Committee  [Emphasis added.]

65.     In this letter, the Committee admitted it had a duty to act solely in the interests of the ESOP participants and that this duty extended to determining if UAL stock was appropriate for the ESOP notwithstanding any provisions of the plan to the contrary.

66.     In recognition of its duty, State Street began selling shares. By September 2002, State Street had sold 9.4 million shares.

**E.      American's Trustees Sell AMR Shares – An Example of Prudent Conduct by Plan Fiduciaries**

67.     On February 4, 2003, the trustee of the American Airlines ("AMR") 401(k) plan dropped AMR stock as an investment option on the grounds that it was too risky an investment. This is an example of how a prudent trustee acts promptly in response to changing financial circumstances.

## CLAIM FOR RELIEF

### (BREACHES OF FIDUCIARY AND CO-FIDUCIARY DUTIES IN VIOLATION OF ERISA 29 U.S.C. § 1104 (A)(1)(A)-(D), 29 U.S.C. § 1105)

68.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if set forth fully herein.

69.     Each of the defendants acted as a fiduciary under 29 U.S.C. § 1002(21)(A) with respect to the ESOP and its participants.

70.     Each of the defendants was also a co-fiduciary of the other defendants, under 29 U.S.C. § 1105, with respect to the ESOP and its participants.

71.     The defendants breached the fiduciary duties they owed Plaintiffs, the
Class and the ESOP when they: (1) failed to appoint an independent fiduciary which was
required due to their disabling conflict of interests; (2) continued to provide Company
stock to fulfill their obligations under the ESOP; (3) failed to move the ESOP's holdings
of Company stock to the most profitable alternative and appropriate assets available; and
(4) failed to disclose that the stock was an imprudent investment – all at a time when they
knew or should have known that the Company stock was no longer a prudent investment
for the ESOP as a result of the Companies' catastrophic losses and dubious prospects for
the future. As CEO James Goodwin told employees in Mid-October of 2001, the
Company was "literally hemorrhaging money;" so bad was the situation that Goodwin
accurately predicted in October 2001 that the Company might "perish sometime next
year." Regardless of the wording of the ESOP documents, defendants were bound by
their duties of prudence and loyalty to disregard the Plan's requirements when, as here,
following the Plan's requirements was itself disloyal and imprudent.

72.     Regardless of any terms of the Plan, defendants had a duty under 29
U.S.C. § 1104(a)(D) to: (1) cease making purchases of Company stock in the ESOP,
(2) sell all or portions of the Company stock that was then in the ESOP, and (3) to
appoint an independent fiduciary.

73.     Defendants were compromised by the conflict between their interest as
owners of the Company and their duty under ERISA to objectively protect the pecuniary
interests of the Plan and its participants. In light of this conflict, it was incumbent upon
these defendants to obtain an independent and objective assessment of the prudence and
propriety of Company stock as Plan investment. Their failure to do so is itself a breach
of their duty of loyalty. *Indeed, once the ESOP delegated the management of the
ESOP to an objective fiduciary, State Street, State Street began selling of the Company
stock because they quickly concluded it was an imprudent investment.* Had the

defendants conducted a similar inquiry in July of 2001, they would have reached the same conclusion.

74.     Each of the defendants knowingly participated in these fiduciary breaches by their co-fiduciaries, enabled the co-fiduciaries to commit such breaches by their failure to comply with the provisions of 29 U.S.C. § 1104 (a), and had knowledge of the breaches of the co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

75.     The above described breaches of fiduciary duty give rise to the presumption that, but for the breaches of fiduciary duty, the Plan's assets would not have been maintained and further invested in Company stock and would have instead been moved to the most profitable alternative asset available.

76.     As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries millions of dollars.

77.     Pursuant to 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109 (a), the defendants are liable to restore the losses to the Plan and its participants caused by their violation of their fiduciary duties.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     That this Court certify this action as a class action under Rule 23(b)(1), 23(b)(2) and 23(b)(3);

B.     That this Court declare that each of the defendants have violated the duties, responsibilities and obligations imposed upon them as fiduciaries by ERISA;

C.     That this Court order the defendants to restore to the Plan on behalf of each member of the Plan the losses suffered as a result of defendants' breaches of fiduciary duty;

E.     That this Court award to Plaintiffs reasonable costs and attorneys' fees;

F.     That this Court grant such relief as may be just and proper.

DATED:  February 28, 2003.

THE WEXLER FIRM

By
          Kenneth A. Wexler
          Elizabeth Fegan Hartweg
One North LaSalle St., Suite 2000
Chicago, IL  60602
(312) 346-2222

Steve W. Berman
Thomas M. Sobol
Clyde A. Platt
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

Attorneys for Plaintiffs

Civil Cover Sheet                                                                    Page 1 of 1

**DOCKETED**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

MAR 0 4 2003

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s):** JERRY R. SUMMERS, GEORGE LENORMAND, and WOOD D. EPPELSHEIMER, individually and on behalf of all others similarly situtated

**Defendant(s):** UAL CORPORATION EMPLOYEE STOCK OWNERSHIP PLAN, UAL CORPORATION ESOP COMMITTEE, DON CLEMENTS, MARTY TORRES, BARRY WILSON, DOUG WALSH, IRA LEVY and JANE and JOHN DOES consisting of unknown members of the ESOP Committee

County of Residence: Orange County, CA

County of Residence: Cook County, IL

Plaintiff's Atty:  Kenneth A. Wexler
The Wexler Firm
One North LaSalle St., Suite 2000,
Chicago, IL 60602
(312) 346-2222

Defendant's Atty:

03C 1537

II. Basis of Jurisdiction:          **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties
**(Diversity Cases Only)**
Plaintiff:- **N/A**
Defendant:- **N/A**

IV. Origin :                        **1. Original Proceeding**

V. Nature of Suit:                  **791 E.R.I.S.A**

VI. Cause of Action:                **Sections 404-406, 408-409 and 502 of ERISA, 29 U.S.C. Sections 1104-1106, 1108-1109 and 1132**

VII. Requested in Complaint
Class Action: **Yes**
Dollar Demand:
Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date:

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.** Revised: 06/28/00

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

### Eastern Division

**DOCKETED**

MAR 0 4 2003

In the Matter of

JERRY R. SUMMERS, GEORGE T. LENORMAND,
and WOOD D. EPPELSHEIMER v. UAL CORP.
EMPLOYEE STOCK OWNERSHIP PLAN, UAL
CORPORATION ESOP COMMITTEE, MARTY TORRES,
BARRY WILSON, DOUG WALSH, IRA LEVY and
JANE and JOHN DOES

Case Number: 

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiffs Jerry R. Summers, George Lenormand and Wood D. Eppelsheimer

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| | Elizabeth Fegan Hartweg /Kal |
| NAME | NAME |
| Kenneth A. Wexler | Elizabeth Fegan Hartweg |
| FIRM | FIRM |
| The Wexler Firm | The Wexler Firm |
| STREET ADDRESS | STREET ADDRESS |
| One North LaSalle Street, Suite 2000 | One North LaSalle Street, Suite 2000 |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| Chicago, IL 60602 | Chicago, IL 60602 |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| (312) 346-2222 | (312) 346-2222 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| 3127810 | 60861479 |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES NO ✔ |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES ✔ NO |
| | DESIGNATED AS LOCAL COUNSEL? YES ✔ NO |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| Clyde A. Platt /Kal | Steve W. Berman /Kal |
| NAME | NAME |
| Clyde A. Platt | Steve W. Berman |
| FIRM | FIRM |
| Hagens Berman LLP | Hagens Berman LLP |
| STREET ADDRESS | STREET ADDRESS |
| 1301 Fifth Avenue, Suite 2900 | 1301 Fifth Avenue, Suite 2900 |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| Seattle, WA 98101 | Seattle, WA 98101 |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| (206) 623-7292 | (206) 623-7292 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| | 3126833 |
| MEMBER OF TRIAL BAR? YES NO ✔ | MEMBER OF TRIAL BAR? YES NO ✔ |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES ✔ NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO ✔ | DESIGNATED AS LOCAL COUNSEL? YES NO ✔ |

1-3

03C1537

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

In the Matter of

JERRY R. SUMMERS, GEORGE T. LENORMAND,
and WOOD D. EPPELSHEIMER v. UAL CORP.
EMPLOYEE STOCK OWNERSHIP PLAN, UAL
CORPORATION ESOP COMMITTEE, MARTY TORRES,
BARRY WILSON, DOUG WALSH, IRA LEVY and
JANE and JOHN DOES

Case Number:

**DOCKETED**

MAR 0 4 2003

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiffs Jerry R. Summers, George Lenormand and Wood D. Eppelsheimer

| (A) | (B) |
|---|---|
| SIGNATURE *Thomas M. Sobol / KAW* | SIGNATURE |
| NAME Thomas M. Sobol | NAME |
| FIRM Hagens Berman LLP | FIRM |
| STREET ADDRESS 1301 Fifth Avenue, Suite 2900 | STREET ADDRESS |
| CITY/STATE/ZIP Seattle, WA 98101 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (206) 623-7292 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☐ NO ☑ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☑ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☐ NO ☑ |
| TRIAL ATTORNEY? YES ☐ NO ☑ | TRIAL ATTORNEY? YES ☐ NO ☑ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ |

1-3