

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JERRY R. SUMMERS and GEORGE T. )
LENORMAND, individually and on )
behalf of all others similarly situated, )
)
)
Plaintiffs, )
)
v. ) No. 03 C 1537
)
)
UAL CORPORATION ESOP )
COMMITTEE, MARTY TORRES, )
BARRY WILSON, DOUG WALSH, )
IRA LEVY, DON CLEMENTS, CRAIG )
MUSA and STATE STREET BANK )
& TRUST COMPANY, )
)
Defendants. )

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on the parties' motions for summary judgment and on Defendant State Street Bank and Trust Company's ("State Street") motion to exclude Plaintiffs' expert opinions and testimony. For the reasons stated below, we deny Plaintiffs' partial motion for summary judgment, grant State Street's motion for summary judgment, and grant State Street's motion to exclude Plaintiffs' expert

1

testimony.

## BACKGROUND

Plaintiffs were all participants in the United Airlines Corporation Employee Stock Ownership Plan ("Plan"). According to Plaintiffs, United Airlines ("UAL") was in financial trouble in July 2001, and after September 2001, UAL's financial position worsened. Plaintiffs claim that from August 2001 to August 2002, UAL stock prices fell over 80 percent in value. Plaintiffs contend that until August 2002, neither Defendant UAL Corporation ESOP Committee ("Committee"), the named fiduciary of the Plan, nor Defendant State Street, the trustee of the plan, took appropriate actions to protect the Plan assets by diversifying the stock held by the Plan. It is further alleged by Plaintiffs that the Committee members were not aware of the fiduciary duties they owed to the Plan. In August 2002, UAL announced that it might seek bankruptcy protection.

According to Plaintiffs, in September 2002, State Street notified the Committee of its fiduciary duties and nine days later, on September 27, 2002, the Committee began selling the Plan's UAL stock. Plaintiffs claim that by September 27, 2002, the UAL stock had already dropped to $2.36 per share and the Plan had already lost approximately two billion dollars as a result of the decrease in the value

of the stock. UAL subsequently filed for bankruptcy. UAL and the individual committee member Defendants have entered into a settlement agreement in this action and State Street remains as an active Defendant. Plaintiffs have filed a partial motion for summary judgment and State Street has filed a motion for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in

[Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

### I. Opinions and Testimony of Lucian Morrison

State Street moves to strike or exclude the opinions and testimony of Plaintiffs' expert witness Lucian Morrison ("Morrison"). Federal Rule of Evidence 702 provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony

4

is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. A court in evaluating expert testimony must apply the *Daubert* analysis. *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 420 (7th Cir. 2005). Under such an analysis, the court must first assess the reliability of the expert's testimony, considering whether "the proposed witness would testify to valid scientific, technical, or other specialized knowledge." *Id.* Secondly, the court must assess the relevance of the expert's testimony, considering whether the "testimony will assist the trier of fact." *Id.*; *see also Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005)(stating that an examination of an expert's credentials to determine if he possesses sufficient knowledge, skill, experience, training, or education is not in and of itself a sufficient analysis and that the "district court must also, in keeping with its gatekeeper's duty, assess the reliability of the *methodology* the expert has employed in arriving at his opinion"). Thus, the district court acts as a "gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004). In determining whether expert testimony is admissible, the court should also consider the following non-exhaustive list of factors: "(1) whether the theoretical framework or technique underlying the witness's testimony ... is subject to verification through testing, (2) whether it has been subjected to peer review and publication, (3) what its known or potential rate of

error is, (4) whether there are standards controlling its application, and (5) whether it is generally accepted within the relevant expert community." *Id.*

In the instant action, Plaintiffs seek to offer Morrison's opinion that UAL's bankruptcy was imminent in October 2001, and that Defendants failed to act prudently by neglecting to sell the UAL stock to protect the interests of the Plan participants. Morrison has prior experience acting as a professional fiduciary and has managed bank and trust activities when working for several banking and trust companies. He has also served as a trustee for employee benefit plans. However, State Street correctly points out that Morrison's opinions range far beyond the proper actions of a fiduciary and delve into areas of bankruptcy, insolvency, economics, and the securities industry. Plaintiffs have not shown that Morrison possesses the requisite "knowledge, skill, experience, training, or education" in such specialized areas. Fed. R. Evid. 702. The bankruptcy of UAL and its surrounding circumstances are key factors in assessing State Street's actions. Morrison is wholly deficient to offer expert testimony regarding such matters. Although he has some experience that has touched on the areas of economics, the securities industry, and corporate bankruptcies, such experience is not sufficient to qualify him as an expert in such areas. The bankruptcy of UAL is such an integral part of the claims in the instant action that a complete and thorough understanding of such matters is crucial to making any sort of informed testimony concerning the propriety of Defendants' actions.

Morrison's lack of expertise in bankruptcy matters and related matters is illustrated by the deficiency in his methodologies utilized in forming his opinions in the instant action. Morrison attempts to sidestep the necessary detailed expert analysis of UAL's financial condition by relying on external factors and extraneous evidence, such as statements made in a letter by UAL's CEO. The trier of fact can read and analyze such letters without the assistance of an expert, and Morrison's speculation based on such evidence is nothing more than a guess. Morrison has not shown to the court that he utilized any reliable tests or methodologies to support his opinions. Morrison has not shown, for example, that he has utilized a methodology commonly employed by experts in analyzing bankruptcy situations. Morrison did not conduct a financial analysis of UAL's books or apply any reliable methodology in arriving at his opinions. Instead, Morrison offers his own unsupported theories and conclusions, and offers nothing of benefit to the trier of fact. The trier of fact is presumed to be able to think and reason on its own. An expert is not employed in litigation to "think" for the trier of fact. Rather, an expert may only assist the trier of fact in its understanding of the facts and issues at hand. So called "experts" such as Morrison are not entitled to weigh in with their half-baked opinions in order to attempt to sway the trier of fact in its analysis.

Plaintiffs apparently recognize the impropriety of offering Morrison as an expert and, in an effort to salvage at least some of Morrison's testimony, Plaintiffs ask the court to not engage in a "wholesale exclusion" of Morrison's testimony.

(Ans. Excl. 13). However, we agree with State Street that Morrison's opinions offer virtually nothing to the trier of fact and his uneducated speculation presented under the cloak of an "expert" would only be prejudicial to State Street. Although Morrison claims to have experience and training in certain basic areas that are the focus of the instant action, his lack of expertise in such areas renders all of his conclusions suspect. Therefore, we grant State Street's motion to exclude the opinions and testimony of Morrison.

## II. State Street's Motion For Summary Judgment

State Street moves for summary judgment on all claims brought against it. To start, the fiduciary duties under ERISA are explained in 29 U.S.C. § 1104, which provides the following:

> (a) Prudent man standard of care
> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> (C) *by diversifying the investments of the plan so as to minimize the risk of large losses*, unless under the circumstances it is clearly prudent not to do so; and
> (D) in accordance with the documents and instruments governing the plan

insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(emphasis added); *see also DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990)(stating that in assessing whether "investment strategies were prudent, . . . the ultimate outcome of an investment is not proof of imprudence" and that "[t]he fiduciary duty of care, . . . requires prudence, not prescience"). A breach of fiduciary claim can only be brought against a fiduciary recognized under ERISA. *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004); *see also Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000)(quoting 29 U.S.C. § 1104(a)(1) for the proposition that "[u]nder ERISA, a fiduciary must 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries'"). In regard to monitoring a plan's investments, a fiduciary has a general "duty of prudence." *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003).

We begin our analysis by noting a key fact. As Plaintiffs acknowledge, State Street was required by the Plan documents to invest the Plan funds in UAL stock. State Street could have sold the UAL stock sooner only if it chose to override the Plan's provisions based upon extraordinary circumstances. (Ans. St. SJ 1). If State Street had chosen to sell the UAL stock sooner and that decision proved to be premature, State Street would have breached its fiduciary duty to follow the directions of the Plan.

State Street was a directed trustee pursuant to 29 U.S.C. § 1103(a). As the

9

court explained in *In re WorldCom, Inc. ERISA Litigation*, 354 F.Supp.2d 423 (S.D.N.Y. 2005), a "directed trustee has no duty to investigate the wisdom of [investment] choices or any obligation to render advice regarding the choices" and the trustee's fiduciary duty is essentially to ensure that the actions of a plan are in compliance with ERISA. *Id.* at 449. Both State Street and Plaintiffs argue that the holding in *In re WorldCom, Inc.* supports a finding in their favor. (St. St. SJ 8)(Ans. St. St. SJ 3). We agree with the court's reasoning in *In re WorldCom, Inc.* that "a directed trustee's knowledge that a company's 'stock price and profits were declining and that the company was undergoing a restructuring' is not sufficient to find a breach of a fiduciary duty where the trustee continued to invest plan funds in the company's stock as directed." *Id.* (quoting *Lalonde v. Textron, Inc.*, 369 F.3d 1, 7 (1st Cir. 2004)). The directed trustee can only be held accountable when failing to act upon reliable and trustworthy information. *Id.* n.25. Such information generally consists of "public indicators" that show "an imminent collapse, as opposed to long-term indicators that could, for example, forecast a company's future obsolescence." *Id.* It is important that a directed trustee only be required to act upon reliable information that shows an imminent collapse because otherwise a fiduciary could be cajoled into prematurely selling off an employer's securities. The fiduciary, for all its caution, would not "maintain the investment in the employer's securities," and "it may face liability for that caution," especially if the collapse scare proves to be unfounded and ultimately the "employer's securities thrive." *Moench v. Robertson*,

10

62 F.3d 553, 572 (3rd Cir. 1995).

Plaintiffs' contention that Defendants should have sold UAL stock in October 2001 is mainly based upon a letter written by UAL CEO James Goodwin ("Goodwin letter"). Plaintiffs contend that the letter clearly showed that UAL was facing imminent financial collapse. However, State Street has provided ample evidence that indicates that during the fall of 2001, UAL was not facing imminent financial collapse. We are not, as Plaintiffs suggest, simply giving more weight to State Street's position because they have presented more expert opinions in their favor. Although the opinions of Morrison, Plaintiffs' expert, are unreliable to such an extent that they cannot be presented to the trier of fact, we have not simply accepted the veracity of State Street's expert opinions in default. Instead, we have thoroughly examined all of the opinions and conclusions of all of the experts, and have analyzed each of the expert's conclusions individually. The evidence presented by State Street is such that no reasonable trier of fact could conclude that UAL was facing imminent bankruptcy in October 2001. Our conclusions would not be altered even if we had considered Morrison's testimony and opinions. For instance, the evidence undeniably shows that UAL had a realistic expectation of receiving the grants and loan funds that it sought. The evidence also clearly shows that UAL had a strong cash position and the market indicators did not show that UAL was facing imminent bankruptcy.

Plaintiffs misquote the Goodwin letter in order to make their point that

Goodwin was signaling that UAL's bankruptcy was imminent. Plaintiffs claim that Goodwin stated that UAL would "'perish next year' - which was then only 10 weeks away." (Ans. St. SJ 1). Plaintiffs thus assert that such a statement meant that in October 2001 the bankruptcy was a few months away at the beginning of 2002. However, in actuality, Goodwin stated in his letter that UAL would "perish *some time* next year," which clearly indicates that any such problems could very easily have been far off in 2002. (Goodwin Let. 1)(emphasis added).

Also, Plaintiffs attempt to pull quotes from the Goodwin letter out of context. There is no indication that the letter was intended to provide an anticipatory notification of the inevitability of UAL's bankruptcy. Rather, the letter was clearly, as State Street refers to it, a "rallying call to the employees and the unions to come to the bargaining table, warning that if they did not, and various other events (such as obtaining a loan) did not occur, UAL [might] 'perish.'" (St. SJ Mem. 10). Nowhere in the Goodwin letter did Goodwin indicate that bankruptcy was imminent. Rather, Goodwin stated that UAL might ultimately perish down the road if certain issues were not addressed. This is clear, for example, by Goodwin's reference to the fact that if UAL did not succeed in certain areas, UAL would "*eventually* run out of money." (Goodwin Let. 1)(emphasis added). There is certainly no indication of imminent financial collapse from an assertion that there "eventually" may be such a collapse. The fact that Goodwin was not seeking to broadcast the inevitable financial collapse is also evident from the positive manner in which the letter is

concluded: "The sooner we get to breakeven, the sooner we'll remove the doubts about our future." (Goodwin Let. 2).

State Street also correctly points out that the mere fact that the UAL stock price fell after terrorist attacks in September 2001, did not mean that UAL was doomed at that point to financial collapse. There were sufficient indications that UAL could recover from its setbacks, and Plaintiffs now in hindsight unfairly seek to hold State Street accountable for not foreseeing the future and for failing to foresee UAL's ultimate filing of bankruptcy. Plaintiffs also attempt to hold State Street liable as an investment manager. State Street concedes for the purposes of its summary judgment motion that it became an investment manager as of August 2002. However, the evidence clearly shows that State Street began to sell UAL stock within one month of becoming the investment manager. The evidence also clearly shows that any delay on the part of State Street was part of a well thought out investigation to determine the best course of action, as required of any fiduciary.

Plaintiffs also seek to hold State Street liable as a co-fiduciary for violating the duties of prudence and loyalty pursuant to 29 U.S.C. § 1105(a), for enabling the Committee members to breach their fiduciary duties. However, the vast array of evidence in this case shows that UAL was not facing imminent bankruptcy in the fall of 2001 and that State Street, as a co-fiduciary of the Committee, did not breach its fiduciary duties. No reasonable trier of fact could find otherwise. Also, State Street reasonably believed that the Committee was fulfilling its fiduciary obligations. It

13

was the Committee that had the primary responsibility of monitoring the investments in the Plan. It is undeniable, based upon the evidence, that the Committee members understood their fiduciary duties, including the need to diversify the Plan investments. Plaintiffs have not provided any evidence that shows that State Street representatives were present during the entirety of all of the Committee meetings or during all discussions between Committee members and their advisors. Plaintiffs also admit pursuant to Local Rule 56.1 that in the fall of 2001, the Committee's own attorneys, Bonnie Levitt and Marian Durkin, "did not believe that UAL's bankruptcy was imminent, and did not believe it necessary to advise their clients to override the Plan." ( R St. SF 61). Plaintiffs contend that State Street should have done more to provide the Committee with advice and information. However, State Street was not obligated to act as legal counsel for the Committee. In fact, the Committee had retained its own legal counsel. The evidence unquestionably shows that State Street fulfilled all of its obligations to ensure that the Committee understood its fiduciary duties and its ability to sell UAL stock and kept the Committee adequately informed. The evidence also clearly shows that State Street adequately monitored and evaluated the UAL stock.

Plaintiffs also contend that State Street knew that the Committee members were presented with conflicting loyalties. However, Plaintiffs have not pointed to sufficient evidence that would enable a reasonable trier of fact to conclude that State Street should have recognized any such conflicts or that any such conflicts actually

existed. State Street did nothing more than acknowledge potential conflicts and Plaintiffs have attempted to create such conflicts when none existed. Finally, Plaintiffs complain about the fact that State Street did not notify the Committee that UAL was placed on State Street's internal watch list. However, we agree with State Street that such information did not have to be disclosed by State Street, and thus Plaintiffs' argument in that regard is nothing more than a red herring. The fact that UAL was on the watch list merely indicated that State Street was closely monitoring UAL and did not mean that UAL was facing imminent bankruptcy. The evidence shows that the Committee knew that State Street monitored the UAL stock, and there is no evidence that State Street ever attempted to conceal its monitoring of that stock. Therefore, we grant State Street's motion for summary judgment. Also, based upon the above analysis and the evidence referred to above, we deny Plaintiffs' partial motion for summary judgment.

## CONCLUSION

Based on the foregoing analysis, we grant State Street's motion for summary judgment and deny Plaintiffs' motion for partial summary judgment. We also grant State Street's motion to exclude Plaintiffs' expert opinions and testimony.

                                                  Samuel Der-Yeghiayan
                                                  United States District Court Judge

Dated: October 12, 2005